Aldo A. Badini (SBN: 257086)
abadini@winston.com
Alexandra McTague (SBN: 290664)
amctague@winston.com
James C. Lin (SBN: 271673)
jalin@winston.com
WINSTON & STRAWN LLP
275 Middlefield Road, Suite 205
Menlo Park, California 94025-4004
Telephone:     (650) 858-6500
Facsimile:      (650) 858-6550

Attorneys for Defendants
GREENFLIGHT VENTURE
CORPORATION AND JEFFREY ISAACS

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN FRANCISCO DIVISION

| | |
|---|---|
| WHITEPAGES, INC., a Delaware corporation,<br><br>                     Plaintiff,<br><br>          v.<br><br>GREENFLIGHT VENTURE CORPORATION, a Florida company, JEFFREY ISAACS, an individual,<br><br>                     Defendants.<br>_____<br>GREENFLIGHT VENTURE CORPORATION, a Florida company, JEFFREY ISAACS, an individual,<br><br>                     Counterclaim-Plaintiffs,<br><br>          v.<br><br>WHITEPAGES, INC., a Delaware corporation,<br><br>                     Counterclaim-Defendant. | **Case No. 3:16-cv-00175-RS**<br><br>**ANSWER TO PLAINTIFF'S AMENDED AND SUPPLEMENTAL COMPLAINT FOR DECLARATORY JUDGMENT OF NON-INFRINGEMENT AND COUNTERCLAIM FOR PATENT INFRINGEMENT**<br><br>**DEMAND FOR JURY TRIAL** |

1    Declaratory Judgment Defendants and Counterclaim Plaintiffs Greenflight Venture

2 Corporation and Jeffrey Isaacs (collectively, "Greenflight") hereby respond to Plaintiff Whitepages,

3 Inc.'s Amended and Supplemental Complaint for Declaratory Judgment of Non-Infringement

4 ("Amended Complaint"), and counterclaim for patent infringement as follows:

5                                        **THE PARTIES**

6    1.    Greenflight lacks information sufficient to form a belief as to the truth of the

7 allegations contained in paragraph 1 of the Amended Complaint and on that basis denies the same.

8    2.    Greenflight admits that Greenflight Venture Corporation is a corporation existing

9 under the laws of Florida, with a place of business at 90, Grand Etang, Terres Basses, St. Martin

10 97150, France.  Greenflight denies that its principal place of business is in France.

11    3.    Greenflight admits that Jeffrey Isaacs is an individual and is Chief Executive Officer

12 of Greenflight Venture Corporation.  Greenflight denies that Mr. Isaacs resides in France.

13                                **JURISDICTION AND VENUE**

14    4.    Paragraph 4 of the Amended Complaint contains legal conclusions to which no

15 response is required.  To the extent a response is required, Greenflight admits the allegations in

16 paragraph 4.

17    5.    Paragraph 5 of the Amended Complaint contains legal conclusions to which no

18 response is required.  To the extent a response is required, Greenflight admits the allegations in

19 paragraph 5.

20    6.    Greenflight admits that Apple has a location in Cupertino, California, and that

21 Greenflight  has contacts with Apple.  Greenflight denies the remaining allegations of paragraph 6.

22 Greenflight does not contest personal jurisdiction for the purposes of this action.

23    7.    Paragraph 7 of the Amended Complaint contains legal conclusions to which no

24 response is required, but to the extent a response is required, Greenflight denies the allegations of

25 paragraph 7.  Greenflight is not contesting venue for the purposes of this action.

26                                 **FACTUAL BACKGROUND**

27    8.    Greenflight lacks information sufficient to form a belief as to the truth of the

28 allegations contained in paragraph 8 of the Amended Complaint and on that basis denies the same.

9.      Greenflight admits the allegations of paragraph 9 of the Amended Complaint.

10.      Greenflight admits that Whitepages has an app available via Google Play store and the Apple App Store.  Greenflight denies that it is called "Caller IP."  Greenflight lacks knowledge or information sufficient to form a belief as to the contractual relationships between Whitepages on the one hand, and Apple or Google on the other, and therefore denies the allegations regarding the same.  Greenflight denies the allegations of the last sentence of paragraph 10.

11.      Greenflight Venture Corporation admits that it is the owner by assignment of an interest in U.S. Patent No. 8,861,698 (the "'698 patent"), and further admits that the '698 patent is entitled "Post-Page Caller Name Identification System."  Greenflight admits that a copy of the '698 patent was attached as Exhibit A to the Amended Complaint.

12.      Greenflight admits that Jeffrey Isaacs is the named inventor of the '698 patent, that an assignment agreement between Greenflight Venture Corporation and Jeffrey Isaacs was executed on January 14, 2016, that it was recorded with the United States Patent and Trademark Office, and that the assignment agreement was attached as Exhibit B to the Amended Complaint.  Greenflight denies the remaining allegations of paragraph 12.

13.      Greenflight admits that it submitted a written complaint on August 22, 2015 to Apple in Cupertino, California via the App Store Content Dispute procedure.  Greenflight admits it identified the '698 patent to Apple and stated to Apple that Whitepages substantially duplicated Greenflight's CNAM based query system.  Greenflight denies the remaining allegations of paragraph 13.

14.      Greenflight admits the allegations contained in the first sentence of paragraph 14. Greenflight lacks information sufficient to form a belief as to the truth of the allegations contained in the second sentence of paragraph 14 of the Amended Complaint and on that basis denies the same. Greenflight denies the remaining allegations of paragraph 14.

15.      Greenflight admits that claim 1 of the '698 patent contains the language "an SS7 interfacing node permitting real-time access to the SS7 network,"  but directs the Court to the entire claim and patent for its contents.  Greenflight denies the remaining allegations of paragraph 15 and specifically denies that it has acted in bad faith.

16.     Greenflight admits that during prosecution of the '698 patent, Mr. Isaacs submitted a response dated August 17, 2014, which responded to an office action from the patent office that rejected claims of the '698 patent.  Greenflight denies the remaining allegations of paragraph 16.

## FIRST CAUSE OF ACTION
### (Declaratory Judgment of Non-Infringement Against All Defendants)

17.     Greenflight incorporates its responses to paragraphs 1-16 as if fully set forth herein.  Paragraph 17 contains no additional allegations to which a response is required.

18.     Greenflight admits the allegations of paragraph 18.

19.     Greenflight admits that Whitepages denies infringement.  Greenflight denies the remaining allegations of paragraph 19.

20.     Greenflight admits that a substantial controversy exists between the parties.  Greenflight denies the remaining allegations of paragraph 20.

21.     Greenflight admits an actual and justiciable controversy exists between the parties.  Greenflight denies the remaining allegations of paragraph 21.

22.     Greenflight denies the allegations of paragraph 22.

## PRAYER FOR RELIEF

The prayer for relief requires no response, but to the extent a response is required, Greenflight denies any allegations in the prayer for relief.

## COUNTERCLAIM FOR PATENT INFRINGEMENT

## BY GREENFLIGHT VENTURE CORPORATION AND JEFFREY ISAACS

Counterclaim-Plaintiffs Greenflight Venture Corporations and Jeffrey Isaacs hereby Counterclaim for patent infringement against Counterclaim-Defendant Whitepages, Inc. as follows:

## THE PARTIES

1.     Counterclaim-Plaintiff Greenflight Venture Corporation ("Greenflight") is a Florida Corporation with its headquarters located at 10312 Orchid Reserve Drive, West Palm Beach, FL 33412.  Greenflight operates an application, or "app," called "Caller-ID" on the Apple iTunes App Store.

2.     Counterclaim-Plaintiff Jeffrey Isaacs is an individual and is CEO of Greenflight

3

1   Venture Corporation.   (Greenflight Venture Corporation and Jeffrey Isaacs shall be collectively

2   referred to as "Counterclaim Plaintiffs").

3          3.      Upon information and belief, Defendant Whitepages, Inc. ("Whitepages") is a

4   Delaware corporation with its headquarters located at 1301 Fifth Street, #1600, Seattle, WA 98101.

5   Whitepages operates an app on the Apple iTunes App Store called "ID BY WHITEPAGES," which

6   on information and belief, is now released as "Whitepages ID," and an app on Google Play called

7   "Whitepages Caller ID & Block" (collectively, "Accused Products").

8                          **JURISDICTION AND VENUE**

9          4.      Counterclaim Plaintiffs assert a claim for patent infringement against Defendant

10  arising under the patent laws of the United States, Title 35 of the United States Code.  Accordingly,

11  this Court has jurisdiction over the subject matter of this action under at least 28 U.S.C. §§ 1331 and

12  1338(a).

13         5.      Venue is proper in this judicial district under 28 U.S.C. §§ 1391 and 1400(b).

14         6.      Jurisdiction and venue are proper in this district because Defendant Whitepages has

15  availed itself of this district to resolve the instant dispute.  It has further represented to this Court, in

16  paragraph 10 of its Amended Complaint, that it has contractual relationships with Google and Apple,

17  both of which are located in this judicial district, and that it seeks to maintain a "positive relationship

18  and good reputation" with those companies "to ensure successful distribution of the Whitepages

19  Caller ID app."

20                                **FACTS**

21         7.      Greenflight Venture Corporation is a small startup company founded by Jeffrey

22  Isaacs, its CEO, based on technology he invented and patented.  Greenflight's technology allows a

23  mobile phone user to identify the name associated with a particular phone number through a reverse

24  lookup.  But unlike reverse phone lookup internet technology available prior to his invention,

25  Greenflight's technology connects an internet search to phone carrier databases associated with the

26  Public Switched Telephone Network ("PSTN"), to identify caller name information.

27         8.      On October 14, 2014, the United States Patent and Trademark Office ("USPTO")

28  duly and legally issued U.S. Patent No. 8,861,698 ("'698 Patent"), entitled "Post-Page Caller Name

Identification System," to inventor Jeffrey D. Isaacs.  A true and correct copy of the '698 Patent is attached hereto as Exhibit A.

9.      The '698 Patent is currently in full force and effect and is entitled to a presumption of validity under the law.

10.     Greenflight Venture Corporation and Jeffrey Isaacs own all right, title, and interest in the '698 Patent, including the right to sue for past, present, and future infringement of that patent.

11.     The '698 Patent describes and claims a novel convergence of two telephone network related technologies, namely SS7 Caller Name ID ("CNAM"), and internet based reverse telephone number search.

12.     Originally, the Baby Bells disbursed paper phone books to each landline customer, which served as the primary mode of looking up a phone number by the customer's name.  In the 1980s, telephone companies began offering "Caller Name ID" as an add-on feature for a landline telephone subscription.  Caller Name ID was supported by CNAM, which at that time was reaching widespread use by the carriers.  CNAM allowed a carrier to determine the name of the calling party and display that to the called party for calls between landline phones.  Prior to that time, a called party generally had no way to trace the name of a caller; calls were anonymous.  CNAMs were stored in a relatively small number of databases managed by the "Baby Bell" companies.

13.     Upon information and belief, in 1997, Whitepages copied or otherwise licensed the Baby Bell phonebooks onto their internet searchable database.  This had one effect of allowing reverse telephone number lookups via the internet to become possible for the mainstream telecom customer.  By entering a phone number to search for the owner name, some aspects of "Caller Name ID" became available without a full CNAM subscription.  The limitation of this method, of course, was that it only included listed numbers for landlines contained in public telephone books, and did not include cell phone numbers.  It also relied on data from a single snapshot of time and could not account for new telephone numbers or changed numbers as those additions or changes occurred.  Whitepages charged for the service.  Over time, Whitepages added other data sources to its database of information to expand its reverse phone lookup service, but what it lacked was access to a growing majority of cell phone numbers and their associated names.

14.     Although mobile phones and smart phone technology features sets proliferated in the last decade, cell phone Caller Name ID did not.  Various factors contributed to the relative absence of Caller Name ID.  First, deregulation of telecom carriers of different types (e.g., VOIP, wireless, etc.) meant a much larger number of CNAM databases than the handful of Baby Bell CNAM databases.  Second, fierce competition over basic monthly rates necessitated unbundling Caller Name ID.   As a result, many mobile phones today will display "UNKNOWN CALLER," or a city name, e.g., "PALO ALTO" instead of the name of the person who owns the account for the calling number.  In short, despite great advances in the past decade related to mobile phone technology, Caller Name ID was often left behind.

15.     The lack of CNAM information on mobile phones created a less than ideal situation for the average consumer.  Mobile phone owners often do not know who is calling them, and as noted, Whitepages technology of copying phone books onto the internet suffered from the drawback of lacking mobile phone numbers.  In the words of Alex Algard, Whitepages' founder, on Fox News with Maria Bartiromo in December 2015, "landlines are dying a fast death."

16.     This left reverse phone search users with little recourse for mobile telephone numbers.  As to Whitepages, when no result is returned on its website or app, it monetizes its product by referring the customer to paid search services.   These services, such as US Search, then bait the customer with a nominal introductory charge to look up the phone number in proprietary databases, which, upon information and belief, stem from credit card, bank, and other undisclosed sources.  Upon information and belief, the customer also typically agrees (whether they mean to or not) to a recurring monthly subscription of approximately $19/month.  Even still, the secondary sources used by these services are often not as complete as a CNAM database directly from the carrier.  Upon information and belief, these practices result in numerous complaints to Whitepages and its partners.

17.     Even though Caller Name ID is not used on most mobile phones, carriers nonetheless still maintain CNAM databases for all of their mobile phone subscribers.  CNAM databases containing mobile phone information reside with the carriers and are typically accessed through the industry standard SS7 protocol.  CNAM database fields, and the protocol to retrieve this

information, have historically been truncated to 15 characters, including spaces.  Thus, if the owner of a number is Greenflight Venture Corporation, a Caller Name ID result would only return "Greenflight Ven."  Upon information and belief, other sources of data, such as credit card company or property ownership databases, do not have the same 15 character limit.

18.     In 2013, Jeffrey Isaacs conceived of and invented a technology that bridged the gap between CNAM and internet reverse search.  He filed for and obtained a patent on his invention, which is known as the Post Page Caller Name Identification System.  It is described and claimed in the '698 Patent.  In particular, the '698 Patent describes a system and method in which a user can input a telephone number into a website or mobile phone interface, separate and apart from end-user phone carrier feature subscriptions, and return the name information associated with the queried phone number.  To accomplish this in practice, Greenflight uses an SS7 query to a CNAM database to obtain the caller name information.

19.     Greenflight released its "Caller-ID" app onto the Apple iTunes App Store in the summer of 2013.  It was made available for free.  The app has over ten thousand positive user reviews; representative reviews include "finally, a phone search that didn't ask for my credit card number," "far superior to Whitepages," "the only one that works," "why wasn't this invented ten years ago," and so forth.  Greenflight provides its app to users for free, instead generating revenue through advertising rather than direct user payments.

20.     In the summer of 2014, just a year after Greenflight introduced its app, and as Greenflight began to take away Whitepages' market share in reverse phone lookups, Whitepages introduced version 1.0 of its "ID by Whitepages" app for the iPhone on the Apple App Store.  It too offered its app for free.  Upon learning of Whitepages' new app, and concerned about infringement of the '698 patent, Greenflight investigated ID by Whitepages by running test phone number queries.  These tests determined that ID by Whitepages frequently returns name results that are truncated at 15 characters.  Whitepages' previous iPhone apps did not typically truncate to 15 characters.  Hence, it appears ID by Whitepages utilizes distinctly different data source(s) than Whitepages' prior apps, and moreover, that one of these sources is in fact CNAM.  Greenflight is unaware of any method other than SS7 for accessing a carrier's CNAM database.  In other words, Greenflight asserts that if

7

name data originally derives from a CNAM database, SS7 compatible protocols were utilized.  The CNAM SS7 query is such a common occurrence that the telecom industry simply refers to it as a name "dip."  SS7 dips occur daily by the millions across all of the international SS7 networks.

21.     In accordance with Apple's App Store terms and conditions, Greenflight engaged in the Apple dispute resolution process.  In August 2014, Greenflight sent an infringement notice to Apple Legal, pursuant to that process, notifying Apple that it believed Whitepages infringed the '698 Patent.

22.     According to the Apple App Store process, the next step was for Whitepages to produce evidence "acceptable to Apple" that Whitepages did not infringe the '698 patent.  Upon information and belief, Whitepages never provided any evidence or documentation of its data source to Apple and why it does not infringe the '698 patent.

23.     Although counsel for Whitepages asserted to Greenflight that Whitepages purportedly does not infringe the '698 patent, to date, it has not provided Greenflight with any evidence to support that assertion.  Specifically, Whitepages does not deny the use of CNAM derived data in its ID by Whitepages app and the Accused Products.

24.     The Accused Products, including ID by Whitepages, infringe at least claims 1 and 5 of the '698 patent.  In particular, the ID by Whitepages app is a mobile phone application and system that functions independently of the called party's carrier and device.  In the ID by Whitepages app, a user inputs a phone number into an entry field to determine who called from that number.  When a result is found in a carrier's CNAM database, the App returns a result often limited to 15 characters, identifying the name associated with the queried number.  Upon information and belief, the 15 character truncation indicates the information originally derived from a carrier's CNAM database via SS7.  The SS7 is a network, and the point at which it was accessed by Whitepages' (or its suppliers') system is defined as the interfacing node.

25.     Upon information and belief, Whitepages directly infringes the '698 patent by making or having made its app and system, and providing that app and system, to users in violation of at least claim 1 of the '698 patent.  Upon information and belief, the ID by Whitepages app's system implements a third-party CNAM query to return the calling party name requested by the user.  The

8

1   CNAM query is assigned by, used, and operated at and under Whitepages' direction and control.

2   Moreover, Whitepages is alleged to make volume payments to its third-party CNAM provider for

3   any and all telcom "dip" fees, which originate from SS7 and CNAM transactions.

4         26.     Upon information and belief, Whitepages also induces its users to infringe at least

5   Claims 1 and 5 of the '698 patent.  In particular, Whitepages provides the complete system for

6   reverse phone lookup via an SS7 CNAM query to users, as described above, who places that system

7   into use when they enter a phone number to query, as claimed in the '698 patent.  Upon information

8   and belief, Whitepages intended their users to download and use the Accused Products in an

9   infringing manner.

10        27.     Whitepages has contributorily infringed at least Claims 1 and 5 of the '698 Patent by

11  providing to users a system for reverse phone lookups, as described above, that has no non-

12  infringing uses.

## PATENT INFRINGEMENT

14        28.     Counterclaim-Plaintiffs reallege paragraphs 7 through 27 of this Counterclaim as

15  though fully set forth herein.

16        29.     Whitepages has directly infringed at least Claim 1 of the '698 patent, and

17  contributorily infringed and induced others to infringe at least Claims 1 and 5 of the '698 Patent by

18  making, having made, importing, using, offering for sale, and/or selling the Accused Products,

19  including the "ID by WhitePages" app, and by performing, implementing, and carrying out,

20  processes and methods with respect to the Accused Products, including the "ID by WhitePages" app,

21  in violation of 35 U.S.C. §§ 271(a), (b) and (c).

22        30.     On information and belief, Whitepages infringement is willful.  Whitepages has been

23  aware of the '698 patent and its infringement thereof since at least January 2016, and upon

24  information and belief, since approximately August 2015 when Greenflight notified Apple of the

25  infringement.

26        31.     Counterclaim-Plaintiffs have been irreparably harmed by Whitepages' acts of

27  infringement of at least Claims 1 and 5 of the '698 Patent, and will continue to be harmed unless and

28  until these acts of infringement are enjoined and restrained by order of this Court.  Counterclaim-

9

ANSWER TO PLAINTIFF'S AMENDED AND SUPPLEMENTAL COMPLAINT  FOR DECLARATORY JUDGMENT OF NON-
INFRINGEMENT AND COUNTERCLAIM FOR PATENT INFRINGEMENT - CASE NO. 3:16-cv-00175-RS

1   Plaintiffs have no adequate remedy at law to redress Whitepages' continuing acts of infringement.

2   Upon information and belief, the hardships that would be imposed upon Whitepages by an

3   injunction are less than those faced by Counterclaim-Plaintiffs should an injunction not issue.

4   Furthermore, the public interest would be served by issuance of an injunction.  Accordingly,

5   Counterclaim-Plaintiffs are entitled to permanent injunctive relief against such infringement

6   pursuant to 35 U.S.C. § 283.

7        32.    As a result of Whitepages' acts of infringement of at least Claims 1 and 5 of the '698

8   patent, Counterclaim-Plaintiffs have suffered and will continue to suffer damages.  Counterclaim-

9   Plaintiffs are entitled to compensation for such damages pursuant to 35 U.S.C. § 284 in an amount to

10  be determined at trial.

11  ### PRAYER FOR RELIEF

12       WHEREFORE, Counterclaim-Plaintiffs request that this Court enter a judgment against

13  Whitepages as follows:

14       (a)    That Whitepages and its parents, affiliates, subsidiaries, officers, agents, servants,

15  employees, attorneys, successors, and assigns, and all those persons in active concert or participation

16  with them, or any of them, be permanently enjoined from making, using, offering for sale, selling,

17  causing to sell, importing, exporting, supplying and/or distributing within, to and/or from the United

18  States, or over the internet or on any app, any method or system which infringes the '698 patent;

19       (b)    A finding that Whitepages has infringed literally and/or under the doctrine of

20  equivalents at least Claims 1 and 5 of the '698 Patent;

21       (c)    A finding that Whitepages' infringement has been willful;

22       (d)    That Counterclaim-Plaintiffs be awarded its actual damages, including without

23  limitation lost profits and/or royalties;

24       (e)    That Counterclaim-Plaintiffs be awarded pre-judgment interest and post-judgment

25  interest at the maximum rate allowed by law, including an award of pre-judgment interest, pursuant

26  to 35 U.S.C. § 284, from the date of each act of infringement of at least Claims 1 and 5 of the '698

27  Patent to the day a damages judgment is entered, and a further award of post-judgment interest,

28  pursuant to 28 U.S.C. § 1961, continuing until such judgment is paid, at the maximum rate allowed

by law;

      (f)     That the Court order an accounting for damages through judgment and post-judgment until Whitepages is permanently enjoined from further infringing activities;

      (g)     That the Court declare this to be an exceptional case pursuant to 35 U.S.C. § 285 and require Whitepages to pay the costs of this action (including all disbursements) and attorneys' fees as provided by 35 U.S.C. § 285;

      (h)     That the Court award enhanced damages pursuant to 35 U.S.C. § 284;

      (i)     That the Court award supplemental damages for any continuing post-verdict infringement up until Whitepages is permanently enjoined from further infringing activities;

      (j)     That the Court award a compulsory future royalty in the event an injunction is not awarded;

      (k)     That the Court require Whitepages to pay interest on such damages at the legal rate;

      (l)     That the Court permanently enjoin Whitepages' infringing activities;  and

      (m)     That Counterclaim-Plaintiffs be awarded such other and further relief as the Court deems just and proper.

## <u>DEMAND FOR JURY TRIAL</u>

      Counterclaim-Plaintiffs hereby request a jury trial for all claims and issues triable by a jury.

Dated:  March 28, 2016          WINSTON & STRAWN LLP

                      By:   */s/ Aldo A. Baldini*
                         Aldo A. Badini
                         Alexandra McTague
                         James C. Lin
                         Attorneys for Declaratory Judgment Defendants and Counterclaim-Plaintiffs
                         GREENFLIGHT VENTURE CORPORATION AND JEFFREY ISAACS

# EXHIBIT A

US008861698B1

(12) **United States Patent**　　　　　(10) **Patent No.:**　　**US 8,861,698 B1**

Isaacs　　　　　　　　　　　　　　　　(45) **Date of Patent:**　　　**Oct. 14, 2014**

(54) **POST-PAGE CALLER NAME IDENTIFICATION SYSTEM**

(71) Applicant: **Jeffrey D. Isaacs**, Fort Washington, PA (US)

(72) Inventor: **Jeffrey D. Isaacs**, Fort Washington, PA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **14/174,724**

(22) Filed: **Feb. 6, 2014**

(51) **Int. Cl.**
　　*H04M 1/56*　　　　(2006.01)
　　*H04M 15/06*　　　(2006.01)
　　*H04M 3/42*　　　　(2006.01)

(52) **U.S. Cl.**
　　CPC ................................. *H04M 3/42059* (2013.01)
　　USPC ................................... **379/142.1**; 379/142.15

(58) **Field of Classification Search**
　　CPC ........... H04M 1/26; H04M 1/274508; H04M 1/2745; H04M 1/66; H04M 1/663; H04M 1/72519; H04M 1/72547
　　USPC .............. 379/142.01, 142.04, 142.1, 142.11, 379/142.15
　　See application file for complete search history.

(56)　　　　　　　**References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 5,457,738 | A * | 10/1995 | Sylvan | ...................... 379/93.23 |
| 8,625,762 | B1 * | 1/2014 | White et al. | ............. 379/142.06 |
| 2002/0099720 | A1 * | 7/2002 | Bansal | ........................ 707/104.1 |
| 2008/0147771 | A1 * | 6/2008 | Bertolino | ...................... 709/201 |
| 2008/0222144 | A1 * | 9/2008 | Backer et al. | ...................... 707/5 |
| 2008/0240383 | A1 * | 10/2008 | Fronczak et al. | ......... 379/88.19 |
| 2009/0328118 | A1 * | 12/2009 | Ravishankar et al. | ........ 725/106 |
| 2013/0287196 | A1 * | 10/2013 | Zerillo | .................... 379/142.06 |

* cited by examiner

*Primary Examiner* — Quoc D Tran

(57)　　　　　　　**ABSTRACT**

Caller Name Identification, or CNAM Caller ID, is a telecommunication end-user feature that appeared for PSTN landline customers in the late 1980s. The rapid development of cellular mobile and VOIP telephony systems lead to the frequent omission of the CNAM Caller ID feature. Described is an independent end-user system that obtains the CNAM Caller ID after the call page transmission. The system operates on the user's smartphone or on a TCP/IP connected computer. A user with multiple telephone devices (i.e. a smartphone, landline, and VOIP line) may share use of this system between all devices.

**6 Claims, 4 Drawing Sheets**



FIG. 1A  -Prior Art-



SS7 call provisioning
to  CNAM Caller ID
landline phone

617-555-1212
SMITH, ROB

FIG. 1B  -Prior Art-



SS7 call provisioning
to non-CNAM Caller ID
mobile phone

6175551212
BOSTON MA

FIG. 1C  -Prior Art-



SS7 call provisioning
to non-CNAM Caller ID
VOIP phone

INCOMING CALL
FROM
617-555-1212



**FIG. 2**

U.S. Patent          Oct. 14, 2014          Sheet 3 of 4          US 8,861,698 B1

**FIG. 3**



Start

Called party receives calling party CID (phone number) on phone without CNAM Caller ID functionality — **100**

Called party enters CID into the CID entry interface — **101**

The CID is checked against the system opt-out database — **102**

An SS7 session is initated if not already open — **103**

A Global Title Translation is performed via SS7 to locate the calling party's carrier CNAM database, if not known — **104**

An SS7 query containing the CID is sent via GR-1188 or equivalent to the CNAM database — **105**

The calling party's CNAM is returned to the SS7 requesting session — **106**

The CNAM information is presented to the user — **107**

End



Fig. 4

US 8,861,698 B1

1

## POST-PAGE CALLER NAME IDENTIFICATION SYSTEM

### BACKGROUND OF THE INVENTION

1. Field of the Invention

The present invention relates generally to caller identification systems. More specifically, it relates to a post-page caller name identification system that bridges SS7 retrievable caller data with a user-accessible IP interface. Carrier implementation of caller name identification has become increasingly complicated due to the fragmentation of service providers on the North American Public-Switched Telephone Network (PSTN). The present invention restores functionality of this important SS7/PSTN capability, caller name identification, to the increasing number of telecommunications end-users left without this feature.

2. Description of the Prior Art

To place a call using the earliest long-distance telephone systems, a calling party initiated a request with the local switchboard operator. The calling party's local operator would connect to the inward operator, and specify the called party. The inward operator would identify the calling party to the called party, then coordinate the completed telephone circuit with the originating local operator.

Direct dial systems using automated protocols over the Public Switched Telephone Network eventually phased out the operator switchboard system by the 1960's. Unlike the system utilizing human operators, the direct dial networks did not readily identify the calling party to the called party. The relative anonymity of automated PSTN systems created both inconvenience and the potential for abuse. The invention of what became known as caller identification addressed these shortfalls. Between 1969 and 1975, Mr. Theodore Paraskevakos successfully claimed twenty separate patents related to automatic telephone line identification. By 1989, Bell Atlantic, BellSouth, and U.S. West Communications had implemented caller identification in their consumer service offerings.

Caller identification, or Caller ID, may colloquially refer to the presentation of either the calling party's telephone number, or name, to the called party. The initial caller identification systems transmitted only the calling party's phone number to the called party. By their rollout in the late 1980's, or shortly thereafter, the "Baby Bell" Caller ID service offerings typically included both CID and CNAM functionality. These services grew in popularity, with tens of millions of subscribers by the late 1990's. For this specification, caller identification, or CID, refers to the presentation of the calling party's phone number to the called party. Caller name identification, or CNAM Caller ID, shall refer to the presentation of the calling party's name to the called party.

The technical protocols for Caller ID evolved since Mr. Paraskevakos' invention, to what is now industry-standard implementation over the PSTN SS7 network. Despite the standardization of the protocol, telephone line portability deregulation significantly increased the complexity and cost of a CNAM Caller ID query. CNAM information previously held in a few databases of the Baby Bells increased to hundreds, if not thousands, of databases operated by the emerging telephone companies.

At the time of filing, a complete CID & CNAM Caller ID query typically involved the following steps: 1) the CID is transmitted from the calling party to the called party during SS7 call circuit provisioning (the network "page"), 2) a Global Title Translation (GTT) is initiated from the called party's SS7 signaling transfer point (STP) to determine which

2

CNAM database and telephone carrier represents the calling party CID, 3) a GR-1188 CNAM query is relayed via SS7 to the service control point (SCP) for the respective CNAM database, and 4) the GR-1188 CNAM query result is presented to the called party. The exact sequence of events may vary depending upon the called and calling party's inter-carrier agreements and SS7 implementation. Characteristic of the prior art implementations, the entire sequence of events takes place during the ringing or network page, and prior to the call completion.

As mobile phones and voice-over-IP telephony (VOIP) proliferated over the past decade, many providers never implemented full CNAM Caller ID to their mobile or VOIP end-users. Those that did implement CNAM Caller ID usually charge a monthly fee for CNAM Caller ID. For example, a major American wireless carrier recently began offering "Caller Name ID" as a premium monthly feature. Furthermore, individuals now may own several phone numbers, including a home land-line, a personal cellular mobile, and a VOIP line at work. Subscribing to a monthly CNAM service on multiple lines, if the feature is even available, is costly. As a result, CNAM Caller ID prevalence is trending backwards.

### SUMMARY OF THE INVENTION

In view of the foregoing limitations inherent in the known types of caller identification systems present in the prior art, the present invention provides a post-page caller name identification system. This standalone system may function for multiple telephone devices owned or operated by the end-user. The system is independent of the end-user's carrier implementation (or lack thereof) of CNAM Caller ID.

The utility of the present invention, which shall be described subsequently in greater detail, is to identify the calling party's name when only the CID is known. This is typically the case with most modern cellular mobile and VOIP systems. The present invention's post-page functionality complements the prior art. In an ideal telephony network, CNAM Caller ID would be transmitted during the page, or ring. As described above, CNAM implementation has been declining for a decade due to increasing complexity of carriers. This necessitates the present invention as the next-best solution for an end-user wishing to identify a calling party.

To attain this, the present invention comprises a system that interfaces the user directly with the calling party's SS7 SCP-connected CNAM database. After a call or page terminates, the user accesses the present invention via the user terminal, which may operate on a mobile phone application or via direct HTML web access. The user inputs the CID information relayed from the calling party to the end-user. The system then performs a Global Title Translation (GTT) query using its SS7 node. The GTT lookup returns the respective phone carrier and CNAM database applicable to the CID. The system then performs a GR-1188 CNAM query via SS7 to the service control point (SCP) for the respective CNAM database. Finally, the CNAM query result is presented on the user-interface.

By utilizing the present invention, the end-user consolidates CNAM services and enjoys significant cost savings. At time of filing, a commercial implementation of the present invention was offered free-of-charge to the user via either a smartphone applications or direct web access. As stated above, the CNAM functionality offered by the present invention is often unavailable, even as a premium service, on many VOIP and cellular carriers.

The calling party may opt-out from this process at three points. First, the calling party may opt-out from CID trans-

US 8,861,698 B1

**3**

mission on a per-call basis, which is typically known as "*67 Caller ID Block." Second, the calling party may inform his/her carrier to remove his information from their CNAM database. Third, the calling party may opt-out using a form implemented on the privacy policy page of the present invention.

### BRIEF DESCRIPTION OF THE DRAWINGS

Features of the exemplary implementations of the invention will become apparent from the description, the claims, and the drawings in which:

FIG. **1** identified as subparts **1**A, **1**B, & **1**C, represents three typical variations of the caller identification prior art;

FIG. **2** is a graphical depiction of the core system components and their interactions;

FIG. **3** is a flow diagram enumerating each possible step the system performs to process a user query for caller name identification; and

FIG. **4** depicts two additional embodiments of the user interface.

### DETAILED DESCRIPTION

From FIG. **1**, three scenarios are identified which represent the current prior art of caller identification systems. Scenario **1**A represents the ideal provisioning of a call where the called party receives both the name and phone number of the calling. In this case, the CID and CNAM are 617-555-1212 and "Smith, Robert," respectively. Scenario **1**B, the middle illustration, only provides the calling party phone number. This scenario is typical of most cellular mobile carriers. In lieu of the CNAM, the cellular carrier will approximate the location of the calling party, although this is frequently subject to error. Scenario **1**C, illustrated at the bottom of FIG. **1**, depicts a typical VOIP caller identification presentation, which only includes the calling party number (CID).

Having understood the possible combinations of CID and/or CNAM presentations possible on a caller identification system, FIG. **2** embodies the components of the present invention utilized in the context of the scenario depicted in FIG. **1**B. The calling party has placed a call (**1**) over the PSTN, and the carrier has provisioned for the CID and estimated location to be presented on the end-user's telephone screen (**3**) during the network page.

The end-user initiates use of the system by accessing the user terminal. The user enters the CID from (**2**) into the CID entry field (**3**) of the user terminal. After entering a valid CID, the user (**4**) submits the query to the system. The system then initiates the "CNAM database query" (**5**) via the SS7 network.

There exist several methodologies to obtain a CNAM database result via SS7, and the exact implementation depends upon the calling party's carrier, the system's carrier, and any contractual relationships between the two carriers. Exemplified in FIG. **2**, and most typical, the system performs a Global Title Translation (**6**) using various Line Information Databases (LIDBs) to determine the calling party's carrier. In some cases, the system will already know the calling party's carrier (e.g. if they are the same as the called party), and this step will be unnecessary. Once the carrier is known, the system is able to route a CNAM query using GR-1188 (**7**) to the appropriate SS7 signal control point (SCP). The SCP controls CNAM database access for a given phone carrier. For the purposes of this invention, the entire process is referred to as "CNAM Database Query" (**5**) and refers to any of the proper SS7 methods to retrieve CNAM information.

**4**

Upon successful CNAM database query, the CNAM Caller ID is relayed back to the user terminal. The caller name identification is displayed on the appropriate user interface element, thereby completing the process.

FIG. **3** serves as a flow diagram enumerating all possible steps for the system, as embodied, to carry out its function. The utilization of this system commences upon end-user receipt of a CID page (**100**). The user then activates the system by entering the page CID into the CID entry interface (**101**). Before the system proceeds, it first validates that the CID is not listed within the system's opt-out privacy database (**102**). At this stage, the system may also ask the user to confirm the CID had been transmitted to a telephone device they own or operate.

The system then instructs the SS7 interfacing node to initiate an SS7 session, if one is not already active (**103**). The exact state or instructions relayed to the SS7 switch/node varies depending upon carrier implementation. Once the SS7 session is active, a Global Title Translation (GTT) is performed using the CID from the CID entry interface. (**104**). The GTT returns the calling party carrier information necessary to locate the carrier's CNAM database on the SS7 network. A query is thereafter sent, usually via the GR-1188 protocol, to the signal control point (SCP) for the calling carrier CNAM database (**105**). Assuming the calling party didn't opt-out from its carrier CNAM database, the calling party's CNAM is returned to the system's SS7 node (**106**). Then, the CNAM database query result is displayed on the user interface (**107**).

FIG. **4** depicts additional embodiments of the system relating to its user interface. In this illustration, the system's SS7 interface (**200**) is physically separated from its user interface. The user interface is implemented on either another computer linked via the TCP/IP (**204**), or the end-user's telephone that received the initial call page (**203**). The SS7 interface communicates (**201** or **202**) with the user interface via an industry standard API protocol such as JSON.

I claim:

**1**. A system, functioning independently of a called party's telephone carrier and device, provides a calling party's CNAM after entry of the calling party's telephone number CID, comprising:

a) an entry field, within a HTML web or mobile phone application, permitting the called party to input a query, post-page, specifying the CID;

b) an SS7 interfacing node permitting real-time access to the SS7 network;

c) a function serving as a direct interface between the called party's query and the calling party carrier's respective CNAM database;

d) within the HTML web or mobile phone application, a display of the successfully queried calling party CNAM.

**2**. The system of claim **1**, wherein the web or mobile phone application provides free-of-charge CNAM resolution for any of the end-user's multiple telephony devices, thereby permitting cost-savings.

**3**. The system of claim **1**, wherein the called party enjoys significant cost savings and free-of-charge CNAM querying through an advertising display within the user interface.

**4**. The system of claim **1**, wherein component function (c) additionally:

confirms that the CID is not subject to system opt-out privacy controls; and

confirms that the CID paged a telephonic device owned or operated by the called party.

US 8,861,698 B1

5

**5**. A method for providing a called party with the calling party's CNAM after a network page, independent of interaction with the carrier or device receiving the page, comprising the following steps:

a) entering of the calling party's telephone number CID into a web HTML or mobile phone application query field;

b) connecting to the PSTN via an SS7 interfacing node;

c) directly querying the calling party carrier CNAM database with the CID query entry;

d) displaying the successfully queried calling party CNAM on the HTML web or mobile phone application user interface.

**6**. The method of claim **5**, further comprising a step to display advertising sponsorship on the web or mobile phone application interface, thereby achieving significant user cost savings and free-of-charge CNAM querying.

\* \* \* \* \*