Pages 1 - 24

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Richard Seeborg, Judge

WHITEPAGES, INC.,                    )
                                     )
            Plaintiff,               )
                                     )
   VS.                               )        NO. CV 16-00175-RS
                                     )
JEFFREY ISAACS, ET AL.,              )
                                     )
            Defendants.              )
_____ )

                              San Francisco, California
                              Thursday, July 7, 2016

                    **TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiff:

                         FENWICK & WEST, LLP
                         555 California Street - 12th Floor
                         San Francisco, CA  94104
                    BY:  **BRYAN A. KOHM, ESQUIRE**
                         **RAVI RANGANATH, ESQUIRE**

For Defendants:

                         WINSTON & STRAWN, LLP
                         200 Park Avenue
                         New York, NY  10166
                    BY:  **ALDO A. BADINI, ESQUIRE**
                         **CONSTANCE RAMOS, ESQUIRE**
                         **JAMES LIN, ESQUIRE**

Reported By:        Pamela A. Batalo, CSR No. 3593, RMR, FCRR
                    Official Reporter

<u>**Thursday - July 7, 2016**</u>                    **1:29 p.m.**

P R O C E E D I N G S

---oOo---

**THE CLERK:**  Calling CV 16-175, Whitepages, Inc. vs. Isaacs, et al.

Counsel, please come forward and state your appearances.

**MR. KOHM:**  Bryan Kohm, Your Honor, Fenwick & West, for Whitepages.  I have with my colleague, Ravi Ranganath.

**MR. BADINI:**  Good afternoon, Your Honor.  Aldo Badini for Greenflight and Jeffery Isaacs, and my colleagues, Connie Ramos and James Lin.

**THE COURT:**  Good afternoon.

This matter is on calendar for a motion for judgment on the pleadings by the plaintiff in this case in this dec relief action, and it's involving, what we're seeing more and more a Section 101 argument.

The issue, as it is in these cases, is the two-step inquiry on whether or not we've got patentable subject matter, and then in the event, in this instance, that there is an abstract idea identified, whether or not that's, nonetheless, subject to a determination of validity based on the fact that there's an inventive concept involved in this.

So I don't have a tentative to provide to you, but I'll just have some questions.  I notice there is something on the screen.  I tend to disfavor, in motion argument, PowerPoints

1    and the like.  You can certainly use them, but don't expect to

2    do it in lecture format.  I will jump around on you, and I will

3    simply expect that if you've got PowerPoints, you're going to

4    have to go with me and not wait for the place in the PowerPoint

5    to answer the inquiry that we're discussing.  I won't preclude

6    it, but I don't particularly encourage it, to tell you the

7    truth.

8        So why don't we go ahead, and we'll start with the moving

9    party.  Go ahead.

10       Stay up here because I like to have --

11           **MR. BADINI:**  Thank you, Your Honor.

12           **MR. KOHM:**  Thank you, Your Honor.  I appreciate the

13   comments on the PowerPoint.

14           **THE COURT:**  By the way, I know each of you -- well, I

15   know not each of you, but I've been advised of some recent

16   Federal Circuit decisions, two in particular, and I have

17   reviewed those, so you can assume that that's the case.

18       Go ahead.

19           **MR. KOHM:**  All right.  Thank you, Your Honor.

20       Would you be inclined to have bench books --

21           **THE COURT:**  That's fine.  For future reference on

22   motions -- claim construction is fine, tutorials are fine.

23   Motion practice, I am sure -- this is no suggestion you will be

24   subject to this, but I do find that lawyers get wedded to their

25   PowerPoints in a way that reminds me of when, you know, I had

1    my speech to give and judges said *don't give me the speech*.  So

2    that's why I kind of disfavor it.  But go ahead.

3         **MR. KOHM:**  I appreciate that, Your Honor, and I hope

4    that that's not what we have here.  It's really just focused on

5    maybe helping to give some visual points for us to use for

6    talking points.

7         **THE COURT:**  All right.

8         **MR. KOHM:**  Again, Bryan Kohm, Your Honor.

9    So what we're dealing with here in this patent,

10   Your Honor, as we said in our briefing -- and I'm not going to

11   rehash everything, but it's really just -- the claims are

12   directed towards the abstract idea of looking up information in

13   the database.  And the reason why I have these claims up here

14   is I wanted to just really let us focus and see what we're

15   dealing with in the claims.

16       And there's really two parts.  The yellow part, which are

17   the Limitations A and D, focus on the internet interface and

18   then the blue highlighting there for Limitations B and C are

19   the steps directed towards querying the database.  And that is

20   the sum of what we have here for the invention.

21       And Greenflight makes a good amount of argument regarding

22   the SS7 interfacing node.  That's no surprise.  And I think

23   it's interesting because in the counterclaims, in the claims of

24   infringement by Greenflight, what it told us, as you see

25   here -- the quote is that, look, what we have -- what meets

1  this limitation is simply doing a call, a query, to the

2  database, and that's what meets it.  And now in its briefing,

3  it also supports the notion that --

4      **THE COURT:**  Isn't there some concept here that there

5  is a realtime aspect to this that is separate and apart from

6  the principle, that I don't think they argue with, that there

7  is a, even -- prehistory there was a way to look up, take

8  numbers, you can find names; names you can find numbers.  But

9  what they're saying here is you can do it in a more interactive

10  fashion under their patented concept and you can do it in

11  realtime.

12      **MR. KOHM:**  So they do say that, Your Honor.  But

13  what's real -- what's evident from the patent itself -- and

14  this quote right here is where they say that in their briefing,

15  and if you look in the background of inventions section, it is

16  describing exactly that process.  So they did not create any

17  sort of realtimeness.  There is no inventive aspect of that.

18      This is the same description of how the query is made to a

19  database that is not anything that they've added to the art.

20  The only thing -- the only, quote, inventive contribution here

21  that's alleged or that is reflected in the claims is the use of

22  an internet interface to initiate the query.  And that is all

23  that the patentee has added to this process described in the

24  background of the invention.

25      And *Intellectual Ventures* and many other cases, and *Alice*

1  make clear that just adding -- taking something that exists in

2  the world prior to the patent, a normal process, something that

3  is done regularly and applying it to the internet, bringing the

4  internet into it, is not patentable subject matter under 101.

5      **THE COURT:**  The case, though, that was pointed out to

6  me, this *Bascom* case, is interesting because it seems to -- it

7  seems to develop the concept that even if all the pieces of the

8  puzzle are all well-known -- and there is no dispute here, I

9  guess, that this SS7 interactive process is -- otherwise known

10  as, I guess, a dip or whatever they call it, is very

11  well-known, it's the standard in the -- the way in which

12  information is accessed in this world, this *Bascom* case sort of

13  suggests that if the inventive concept can be found when you

14  effectively, in a holistic way, put it all together, why isn't

15  that the case here?  Why aren't they effectively -- with the

16  acknowledgment that the particular pieces of the puzzle are

17  well-known, they have come up with a way to order it and

18  implement it that amount to an inventive concept.

19      **MR. KOHM:**  Right.  And I think, Your Honor, that

20  question hits right to the core issue.  And that is in *Bascom*,

21  there were a number of different elements, a number of

22  different pieces.  Each of those different pieces were out

23  there, and what the Court said is that this was inventive

24  because although there were, I think, maybe five different

25  elements that were out there independently, they had not been

1    put together, those five elements, in that unique order before.

2        We don't have that here.  And the reason why I have this

3    image up is what we have here is the blue part, Limitations B

4    and C.  That is the query that they describe, and that is

5    exactly what was there in the prior art.  That was the prior

6    art query.

7        The only thing that's added in this patent is the use of

8    the internet interface.  There is no order of the parts that's

9    unique here.  There is not a combination of three or four, even

10   more, parts that weren't previously brought together.  All we

11   have is one part, the query, combined with an internet

12   interface.

13       And I think the case law is very clear that if that's all

14   you're doing, you're taking a preexisting system or approach

15   and adding internet access to it -- an internet interface, that

16   that is not what the -- that is not inventive, and *Bascom*

17   doesn't suggest otherwise.  It points to a much more complex

18   combination of the parts.

19       And that's, quite frankly, why the Court got into the

20   issues regarding 103 analysis, is because effectively what the

21   district court did in *Bascom* is it said, you know, Element A

22   was out there, Element B was out there --

23           **THE COURT:**  How complex the -- or how involved the

24   putting together of the parts, is that something we can call on

25   this -- you may well be right, but can it be called on a motion

1   for judgment on the pleadings?  Is that something that needs to

2   be developed?  How complex is this putting together of the

3   parts?

4          **MR. KOHM:**  So I think it can be done on the motion on

5   the pleadings, and the reason why --

6          **THE COURT:**  I know that there are many -- I've done

7   it.  There are certainly -- my question is not can you ever

8   decide this motion on a motion for judgment on the pleadings.

9   No doubt you can.  I've done it.  My colleagues have done it,

10  so I'm not asking that.

11      I'm saying in this particular case, don't we need to

12  develop the factual record on this concept of whether or not

13  there is factually something there in terms of the application

14  of otherwise known technology?

15         **MR. KOHM:**  And I do not think it needs to go to

16  discovery or any other further point, and the reason why,

17  Your Honor, there is no disclosure in the patent whatsoever at

18  how this internet interface is joined with the query.  It says

19  that they're joined, but there is no description of it, so

20  there is no magic sauce, so to speak, or inventive sauce in how

21  the parts are put together.

22      And because the query is not -- they didn't do anything to

23  the query.  The query is what it is.  They rely on the exact

24  description of the prior art to say that this is the way the

25  query can be done.  That the only combination happening is the

1   addition of the internet interface.

2       And there is nothing in the specification, one, even about

3   that -- any sort of programming.  It just generically

4   references a mobile application or a web browser.  It doesn't

5   describe any programming, any unique aspects of it or even how

6   that web application is going to communicate with the query

7   itself.  There is zero disclosure in the patent on that front,

8   and so -- and I think that addresses your question, Your Honor,

9   that there is no factual question here about whether the

10  combination itself is somehow inventive because there is no

11  description on how that combination occurs.

12          THE COURT:  Okay.  Mr. Badini.

13      MR. BADINI:  So let me start with the question that

14  we've been talking about.  We have sort of skipped to step two

15  of *Alice*, which is, is there an inventive concept, but I

16  submit, Your Honor, that this fails even at -- his motion fails

17  even at Step 1.

18      I mean, *Alice* basically asks is this a fundamental

19  practice, long prevalent in our system, and all you've added is

20  do it on a computer.  And I submit that they haven't been even

21  able to show that, that it's -- yes, there were some bits and

22  pieces, and I'll explain to you why those bits and pieces --

23          THE COURT:  Aren't they right that all you're doing is

24  you're applying some technology to this process of effectively

25  looking up directories, going one way or the other, and that's

1    nothing that's beyond an abstract idea.

2         **MR. BADINI:**  Absolutely not.  They're wrong.  And

3    they've injected factual disputes.  They've said, look, reverse

4    phone directories have existed for years.  They cite a

5    Wikipedia article.  Putting aside the fact of the reliability

6    of Wikipedia, you can't do that on a 12(b)(6).

7         But I went and looked at the Wikipedia article, and it

8    doesn't support at all what they say.  And if I may -- may I

9    hand this up, Your Honor?

10        **THE COURT:**  Sure.

11        **MR. BADINI:**  There are two pieces to the article.

12   There is the article itself and there is a newspaper article,

13   which is cited in the article.  And --

14        **THE COURT:**  I did not understand your position to be

15   that it was impossible to do the searches in the past manually.

16   It just was -- it was cumbersome.

17        But is it your position that you can't -- there was no

18   way, prior to your invention, to go from a number to

19   identifying the name?

20        **MR. BADINI:**  Well, let -- we have to talk about two

21   types of searches, landlines and cell searches; right?

22        So for landlines, the Wikipedia article only cites one

23   small town, Clinton, North Carolina, which published, for some

24   period of time, a reverse phone directory.  That's it.  If

25   somebody calls from out of town, you're out of luck because you

don't have that reverse phone directory.  So that's not

evidence of a long-standing practice, and then you say do it on

a computer.

    But the more significant point --

    **THE COURT:**  Well, but isn't -- I mean, you're not

creating any new data in your invention.  If I understand your

invention, you're talking about a mechanism by which you can

access data.  The data was there before your invention, wasn't

it?

    **MR. BADINI:**  The data is in these proprietary carrier

databases, and the patent is very clear, as is our

counterclaim, that they were fragmented, that some of the

carriers did not even offer caller ID so --

    **THE COURT:**  So the answer to my question is they were

there --

    **MR. BADINI:**  They were there.

    **THE COURT:**  -- and you are presenting an invention

which is, for want of a better way to describe it, a mechanism

to access that information.

    **MR. BADINI:**  Correct.  But let me explain what the

invention is because that really goes to the heart of your

question.

    Counsel is focusing on the data dips and saying that's

routine, it was prior art.  There were two parts of the world

that did not talk to each other before this invention.  On the

1    right side, there's the public telephone switching network that

2    uses this SS7 dip.  We did not invent that.  I will concede

3    that.

4         And the way you access the data in that part of the world

5    pre-invention was you go to -- if you own a device and you have

6    Verizon, as an example, you buy caller ID from Verizon, and you

7    could -- you might get access to the CNAM database.

8         The problem is they may not have access to the other

9    databases, and if you have a different device, you're out of

10   luck.  You have to buy another service or go to another

11   carrier.

12        Here -- the other side of the world is the internet, which

13   uses Internet Protocol.  Does not use the SS7 protocol.

14        In the prior art, and we say this in our Complaint,

15   Whitepages took phone books -- phone books -- and put them on

16   the internet and let users pay a fee and gave them reverse

17   lookup capability.

18        Why did our clients say that was flawed?  Number one, you

19   know, the phone books change.  People drop -- it was not

20   realtime.  And, two, you charge for it, and there were other

21   databases out there.

22        So I need go no further, Your Honor, than the second

23   sentence of the patent to tell you what the invention is.  It's

24   very clear.  It's not a generic web interface, which counsel

25   says it is.

1    It says, "More specifically, it," which is a reference

2  back to the invention, "relates to a post-page caller name

3  identification system" -- *post-page* simply means after the call

4  is over -- "that bridges" -- that's the keyword -- "that

5  bridges SS7 retrievable caller data on this side with a user

6  accessible IP interface on this side."

7    Our client invented that bridge.  Now, he's trying to

8  minimize it, but the reason the bridge is important is in the

9  claims.  Claim 1 and Claim 5 both say that this permits

10  functioning independently of a called party's telephone carrier

11  and device.

12    You don't need to subscribe to Verizon and AT&T.  You

13  just -- you don't need to subscribe to the caller ID system of

14  any of them.  And if you use this system, you can look up a

15  call on any device.  You don't have to buy this system on every

16  device.  That's the invention and that's the limitation.

17    Now, the cases that are cited in the brief, as I said, all

18  involve taking an abstract idea that was done for hundreds of

19  years and saying do it on a computer.  That's not what this is.

20    And SS7 is no abstract idea.  I don't even know what it

21  is, being a psychology major, but I'm trying to figure it out.

22  But, you know, SS7 interfacing node is a very specific concept

23  that's in both of the patent claims.

24    And what's interesting is the cases say the touchstone of

25  the *Alice* inquiry is really preemption.  Are you taking over

1   the entire -- and both Whitepages and True Software have said,

2   *We don't infringe*.  *We don't use an SS7 interfacing mode*.  Well

3   if they don't infringe and they don't use the SS7 interfacing

4   mode, where's preemption?

5        **THE COURT:**  If I was to disagree with you on Step 1

6   and determine, contrary to your arguments, that it is an

7   abstract idea, what at Step 2 is the inventive concept?  If you

8   have to fall back on Step 2, what would you identify to me as

9   the inventive concept that the patent presents?

10        **MR. BADINI:**  I would say that the inventive concept is

11   this software bridge that connects one -- this PTSN side to an

12   interface protocol, and nobody had ever built that bridge

13   before this invention.

14        And why is the bridge important?  For the same reasons I

15   told you.  It makes the query carrier independent and device

16   independent.  I would say that's the inventive concept.

17        **THE COURT:**  All right.

18        Mr. Kohm.

19        **MR. KOHM:**  Your Honor, if this patent disclosed a

20   unique bridge, I would agree that it's not subject to 101, but

21   it doesn't.  There is no disclosure here of how --

22        **THE COURT:**  Does the bridge have to be unique for --

23   you're building into that statement the concept that it does

24   have to be, but does it really have to be?  I mean, if -- it

25   gets back to this idea that if you put the pieces together, if

1    the -- the bridge may not be unique, but if nobody before has

2    put all the pieces together, doesn't that give you an inventive

3    concept?

4            **MR. KOHM:**  In this case, no, because it goes back to

5    what I was saying before.  The only combination is this web

6    app.  So the bridge is this web app, the internet interface,

7    which is disclosed as only -- the only disclosure of it is a

8    mobile phone application or a web browser.  The case law is

9    clear that if all you were adding is internet connectivity,

10   that is not an inventive concept.

11         Now, if this patent disclosed a specific mechanism that is

12   used to communicate between the internet and the SS7 query and

13   that there was some particular piece of hardware that they

14   interjected into this, that they added to it that wasn't there

15   before, that might be a different story, but we don't have that

16   here.

17         All we have is the existing SS7 query, and they quote

18   bridge as a web application, and that's all the patent

19   discloses.  It doesn't even disclose what type of web

20   application that would be.

21           **THE COURT:**  Well, how about the -- putting the bridge

22   concept aside, the notion that somehow, as Mr. Badini said,

23   it's now carrier independent and device independent, and that's

24   something new.  How about that?

25           **MR. KOHM:**  One, I just don't think there is any

1  support whatsoever for that in this.  I know the patentee has
2  made those assertions, but if you look at the functionality
3  that they say is the SS7 query, that existed before.  So there
4  is no -- what is it that is making this reach out to different
5  carriers?

6      According to the specification, the process existed
7  before.  That's what they point to.  The notion that oh, now
8  they're able to access all these different carriers, there is
9  simply no support for that.

10      And I think what's really telling is if you look at the
11  opposition brief on Page 5, they specifically say that prior to
12  the '698 Patent, it was just the fact that users themselves
13  couldn't access these databases.  You might have your caller ID
14  box, which I will submit to Your Honor is itself just a
15  miniature little computer, but -- these caller ID boxes had it,
16  but what was lacking, according to the patentee, was the
17  ability for a user to pull up my phone and enter a phone number
18  and submit it that way, and that is just submitting a number
19  through a web app, whereas if you're working at one of these
20  companies, maybe you look it up using a database on your
21  computer, whatever it is.  I don't know.  There is no
22  discussion of it in the patent.

23      But the only new functionality that they offered here was
24  making it accessible via a mobile phone application or a web
25  browser, without any disclosure of how that is done.

1    **THE COURT:**  What is your view on the propriety of my

2    considering, on a motion for judgment on the pleadings,

3    Wikipedia material that you point me to, and why is that not

4    out of bounds in a motion of this kind?

5    **MR. KOHM:**  I don't think you should consider it, and I

6    think we said that in our briefing.  We raised that only to

7    show that unsubstantiated assertions that they were making were

8    wrong.  I don't think that it needs to be considered.  I don't

9    think -- it's certainly outside the bounds and is unnecessary

10   for determination of this.

11   I don't -- I quite frankly don't even think it's that

12   relevant at the end of the day because we have the patent

13   itself unquestionably telling us what existed prior to the

14   patent.

15   **THE COURT:**  Okay.  So you think -- you agree that what

16   I need to do to decide this motion is to limit myself to the

17   patent and to the argument in the briefs, but I can't look

18   beyond that.

19   **MR. KOHM:**  And the pleadings as well, Your Honor.

20   They make representations in the pleadings that I think are

21   very telling.

22   **THE COURT:**  Okay.

23   Mr. Badini.

24   **MR. BADINI:**  So a couple of things.  I think that the

25   arguments that counsel are making may be fine 112 arguments,

but they're not 101 arguments.  When he keeps saying there is
no disclosure of this, that's a 112 argument.  This isn't
enabled.  That's number one.

Number two, the argument proves too much because it would
invalidate every software patent.  I have never seen a software
patent with the code attached to the patent.  It's always
described in English terms, as this patent does.

But if you -- the important point is there isn't a generic
web server here.  You know, I noticed that in his PowerPoints,
he's relying heavily on this *Intellectual Ventures* case,
Federal Circuit 2015, to argue that you can't just say add a
generic web server and make it -- it's the last page,
Your Honor -- and make it patentable.

I took a look at that case, and in that case, there was a
concession by counsel for the patent holder that they didn't
invent the interface.  It says nowhere -- this is from the
opinion.  "Nowhere does Intellectual Ventures assert that it
invented an interactive interface that manages website
content."

So if you use a generic web server -- and what does that
mean?  That's like Chrome, that's like Internet Explorer.  Of
course you can't turn a non-inventive concept into a an
inventive concept by saying *use a generic web server*.

We say in the patent we invented this interface.  Now, he
may have an enablement motion down the line, but it certainly

1    does not defeat our 101 argument to say well, you haven't shown

2    how.

3        I think we have shown how.  If you look at the Column 3

4    and Column 4, we have extensive detail of how this works.

5            **THE COURT:**  Okay.  Any final --

6            **MR. KOHM:**  Just on that very last point, I think you

7    need to look no further than Limitation A in Claim 1 to rebut

8    the notion that Greenflight invented an interactive interface.

9        What they rely on, is quote, "an HTML web or mobile phone

10   application."  I don't hear counsel and I didn't read anything

11   in the briefing saying that they invented HTML web or mobile

12   phone applications.  I think it's well understood that those

13   existed, that those are just general-purpose applications.

14   There is no invented interface here.

15           **MR. BADINI:**  My only final point, Your Honor, would be

16   that much of *Alice*, Step 2, seems to collapse on preemption.  A

17   lot of the cases, including yours, Your Honor, in Genentech

18   Technologies -- I'm sorry -- *Genetic Technologies* talks about

19   preemption, and you say, "It is not the breadth or narrowness

20   of the abstract idea that is relevant, but whether the claim

21   covers every practical application of that abstract idea."

22       And that recent case from yesterday, the Federal Circuit

23   says the patent does not lock up the natural law, and, you

24   know, one of the parties claims it's designed around the same

25   claims that are here.  I think that's fatal to that 101

1 argument.

2       **THE COURT:**  That one, the one from yesterday, was a

3 natural phenomena case.

4       **MR. BADINI:**  Correct.

5       **THE COURT:**  But Step 2 is, nonetheless, the same

6 analytically.

7       **MR. BADINI:**  Correct.

8       **MR. KOHM:**  I will just say on the preemption point,

9 Your Honor, the notion that Greenflight advances in its

10 counterclaim that simply by accessing a CNAM database, you are

11 necessarily practicing the SS7 interface node, I think that

12 actually is locking up the entire ability to access an SS -- I

13 mean, a CNAM database, because they say you meet this

14 limitation if you access a CNAM database.  Final, done.

15    It wasn't about how you access it or the specific

16 mechanism to do it.  They say in their infringement assertions

17 in the counterclaim, if you access it, you necessarily infringe

18 this claim.

19       **THE COURT:**  I take it you agree with the language from

20 my case that counsel read.  Okay.

21    Thank you very much.  I will take the matter under

22 submission and go through the materials again and give you an

23 order.

24       **MR. KOHM:**  Thank you, Your Honor.

25       **MR. BADINI:**  Actually, may I turn to a housekeeping

matter, Your Honor, which may or may not have relevance to this.

Counsel advised me that some of the assets, I believe -- and you'll correct me if I'm wrong -- of the DJ plaintiff may have been transferred to another company, and so we've discussed the issue, and we think the best way to handle this is to do a stipulated new Amended Complaint, or I guess it would be a supplemental Complaint, which we would then respond to, but that may have the effect of altering some of the dates.

**THE COURT:**  Well, should decision on this motion await that process so that it's clear that -- I mean, I assume the arguments don't change with respect to this motion once that amendment process is done, so --

**MR. BADINI:**  So certainly the arguments will not change, but obviously if there is a new Complaint, we will file a new Answer and counterclaims and we might tinker with some things.

**THE COURT:**  Okay.  So what do you want me to do?  Is the request then or suggestion that I should wait for that process and not issue a decision on this until the dust settles and we see, you know, who's who, or should I barrel -- you may get it all done before I issue my order, so I'm not telling you it's imminent, but I just --

**MR. BADINI:**  Let me put it this way.  I believe you can rule in our favor without waiting.

1    I don't agree with counsel's characterization of some of

2    the things we said in our Answer and counterclaims.  And to the

3    extent your opinion is relying on any such things in our Answer

4    and counterclaim, those may be changed.

5         **THE COURT:**  So what is your view about the timing?

6         **MR. KOHM:**  The pleadings have closed as to Whitepages.

7    This is the first I heard counsel inform me that they plan on

8    changing their allegations to try to circumvent the 101 motion.

9         **MR. BADINI:**  That's not what I said.

10        **MR. KOHM:**  In light of that, Your Honor, I need to

11   revisit whether amending the Complaint is the right way to do

12   it or whether we want to just bring the party in in other ways.

13   But I think the pleading are closed as to the parties here, and

14   that's all that is required for a judgment on the pleadings.

15        **THE COURT:**  I think you need some closure on this

16   ministerial, if we can characterize it that way, process.

17        **MR. KOHM:**  We can, by, let's say, Tuesday, work out

18   the process that we are going to implement.

19        **THE COURT:**  Okay.  It may be just by natural process

20   that you'll get that all done before I'm issuing the order.

21   Obviously, if you go through this process and one side or the

22   other says oh, there is going to be a fundamental change of

23   some kind, I need to be alerted to that fact because what I

24   don't want to do is make some -- I don't want to have to

25   reinvent the wheel if I make a decision that then I have to go

1   back and we've got to start over again because something

2   shifted.

3        **MR. KOHM:**  Yes.  To be one hundred percent candid,

4   Your Honor, based on what I just heard, I'm not inclined to

5   amend the Complaint.  If they want to bring an action Hiya -- I

6   will obviously need to confer with my client -- but I don't

7   want to, at this point, go back to starting point A.

8   Whitepages is still an accused infringer.  They have a claim of

9   past damages against them, so it's not a matter -- there is no

10  standing issue, is what I'm trying to get to.

11       **THE COURT:**  Okay.  Well, I, you know -- I'll leave it

12  to the parties to figure out how they want to proceed,

13  obviously, but whatever you do, do it quickly.

14       **MR. KOHM:**  Yes, Your Honor.

15       **THE COURT:**  Okay.

16       **MR. BADINI:**  Shall we inform the Court somehow, or do

17  you want silence --

18       **THE COURT:**  Well, I assume I'll be informed -- if

19  there is some amendments going on, I'm going to be informed.

20  If the parties decide they're not -- nothing is going to change

21  with respect to any amendments or the like, I would like to

22  know that.  So if you could just advise me that you don't, at

23  this juncture, anticipate any further amendment process, that

24  would be nice to know.

25       Do it on joint basis, if you can -- you don't have to

1    necessarily file something, but I don't want, obviously, one

2    side communicating without the other side's involvement.  I

3    just want to know, okay, there is nothing coming, or there is

4    something coming in conjunction with my process here.

5             **MR. KOHM:**  Understood, Your Honor.

6             **MR. BADINI:**  Understood.

7             **THE COURT:**  Thank you.

8

9             (Proceedings adjourned at 2:02 p.m.)

10

11

12                    CERTIFICATE OF REPORTER

13         I certify that the foregoing is a correct transcript

14    from the record of proceedings in the above-entitled matter.

15

16    DATE:   Wednesday, July 13, 2016

17

18    *Pamela A. Batalo*

19    _____
      Pamela A. Batalo, CSR No. 3593, RMR, FCRR
20    U.S. Court Reporter

21

22

23

24

25