UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

WHITEPAGES, INC.,

            Plaintiff,

    v.

JEFFREY ISAACS, et al.,

            Defendants.

Case No.  16-cv-00175-RS

**ORDER GRANTING MOTION FOR JUDGMENT ON THE PLEADINGS**

## I. INTRODUCTION

In this patent infringement action, plaintiff Whitepages, Inc. seeks judgment on the pleadings that the patent-in-suit discloses only "abstract ideas" outside the permissible scope of patent protection, and therefore is invalid under 35 U.S.C. § 101.[1]  For the reasons explained below, the motion is granted.

## II. FACTUAL BACKGROUND[2]

Plaintiff Whitepages, Inc. is a leading source of contact information in North America.  It develops services to assist people with finding, understanding, and verifying personal and business identities.  Whitepages developed a mobile application ("app") called "Whitepages Caller ID," which allows users to block calls, detect spam, and identify ("ID") incoming telephone calls. Defendant Greenflight Venture Corporation is a startup company founded by CEO Jeffrey Isaacs.

---

[1] On July 11, 2016, True Software Scandinavia A.B. gave notice it was joining Whitepages' motion for judgment on the pleadings.  True Software is a defendant in a related case.  *See Greenflight Venture Corp. v. Whitepages, Inc. et al.*, No. 16-cv-01837-RS (N.D. Cal. Apr. 8, 2016).

[2] The factual background is drawn from the pleadings on file.

United States District Court
Northern District of California

Its technology allows a mobile phone user to identify the name associated with a phone number through a reverse lookup.[3]  Greenflight has an app entitled "Caller-ID" ("Greenflight app").

On October 14, 2014, the United States Patent and Trademark Office ("PTO") issued U.S. Patent No. 8,861,698 ("the '698 patent") to inventor and Greenflight CEO, Isaacs.  According to Greenflight, the patent "claims a novel convergence of two telephone network related technologies, namely SS7 Caller Name ID ("CNAM") and internet based reverse telephone number search."  Countercl. ¶ 11.

By way of background, in the 1980s, telephone companies began offering "Caller Name ID" as an add-on feature for a landline telephone subscription.  CNAMs allowed a carrier to determine the name of a calling party and display it to the called party for calls between landline telephones.  Prior to CNAMs, a called party could not trace the name of a caller, so calls in general were completely anonymous.  CNAMs were stored in a relatively small number of databases managed by "Baby Bells," the regional bell operating companies which emerged from the antitrust suit against AT&T.

Around 1997,  Whitepages licensed the Baby Bell phonebooks and placed their contents on its internet searchable database.  This made it possible for mainstream telecom customers to perform reverse lookups using the internet.  In other words, some aspects of "Caller Name ID" became available without a full CNAM subscription.  The limitation of this method was that it included listed numbers only for landlines contained in public telephone books, and did not include cellular telephone numbers, which increasingly were becoming prevalent.  It also relied on data from a single moment in time and thus could not account for new telephone numbers or changes to numbers as additions or changes occurred.

As the years passed, mobile phone and smart phone technology features proliferated, but cell phone Caller Name ID technology did not.  A number of factors contributed to that result.

---

[3] A "lookup" occurs when a person uses an individual's name to find their phone number.  A "reverse lookup" is the opposite—a phone number is used to find out a person's name.

The deregulation of telecommunications ("telecom") carriers resulted in a much larger number of CNAM databases than the handful originally existing in the era of the Baby Bells.  Additionally, fierce competition over basic monthly rates necessitated unbundling Caller Name ID.  The upshot is that most cell phones today display "UNKNOWN CALLER" or a city name like "PALO ALTO," as opposed to the name of the person who owns the account for the calling number.  Still, even though Caller Name ID is not presently used on most cellular phones, carriers nonetheless maintain CNAM databases for all of their mobile phone subscribers.  These CNAM databases reside with the carriers and are accessed through the "industry standard SS7 protocol."  Countercl. ¶ 17.

In 2013, Isaacs embarked on an effort to invent technology that would bridge the gap "between CNAM and internet reverse search."  Countercl. ¶ 18.  The '698 patent is the result of that effort.  It "describes a system and method in which a user can input a telephone number into a website or mobile phone interface, separate and apart from end-user phone carrier feature subscriptions, and return the name information associated with the queried phone number." *Id.* The technology uses an "SS7 query to a CNAM database to obtain the caller name information."[4] *Id.*  Notably, Greenflight is "unaware of any method other than SS7 for accessing a carrier's CNAM database."  *Id.* ¶ 20.  It therefore asserts "if name data originally derives from a CNAM database, SS7 compatible protocols were utilized."  *Id.*  It also notes the "CNAM SS7 *query* is such a common occurrence that the telecom industry simply refers to it as a name 'dip.'"  *Id.* ¶ 20 (emphasis added).

Greenflight released its app on the Apple App Store in the summer of 2013.  A year later, Whitepages introduced version 1.0 of its "ID by Whitepages" app.  Greenflight investigated the Whitepages app and determined that, unlike previous versions, it appeared to utilize new data sources—specifically, CNAM databases.  Believing Whitepages was querying a CNAM database,

---

[4] The SS7 is a network, and the point at which it is accessed is defined as the "interfacing node."  Countercl. ¶ 24.

1    and thus infringing the '698 patent, Greenflight initiated Apple's dispute resolution process.

2         This led Whitepages to file a complaint for a declaratory judgment of non-infringement of

3    the '698 patent on January 11, 2016.  Three days later, Greenflight sued Whitepages and another

4    company—True Software Scandinavia AB—in the United States District Court for the Southern

5    District of Florida.  Greenflight soon stipulated to dismissal of Whitepages and its CEO from the

6    Florida action, then asserted counterclaims here for infringement of claim 1 and contributory

7    infringement of claims 1 and 5 of the '698 patent.  Whitepages answered the counterclaims on

8    April 21, 2016.  It subsequently filed the instant motion for judgment on the pleadings.

9                                **III. LEGAL STANDARD**

10        Federal Rule of Civil Procedure 12(c) provides that "[a]fter the pleadings are closed—but

11   early enough not to delay trial—a party may move for judgment on the pleadings."  A motion for

12   judgment on the pleadings is "functionally identical" to a Rule 12(b)(6) motion to dismiss for

13   failure to state a claim.  *See Dworkin v. Hustler Magazine, Inc.*, 867 F.2d 1188, 1192 (9th Cir.

14   1989).  "A judgment on the pleadings is properly granted when, taking all the allegations in the

15   pleadings as true, [a] party is entitled to judgment as a matter of law."  *Lyon v. Chase Bank USA,*

16   *N.A.*, 656 F.3d 877, 883 (9th Cir. 2011) (quoting *Dunlap v. Credit Protection Ass'n, L.P.*, 419

17   F.3d 1011, 1012 n.1 (9th Cir. 2005)); *see also Turner v. Cook*, 362 F.3d 1219, 1225 (9th Cir.

18   2004) (explaining that all material allegations in the complaint are accepted as true and construed

19   in the light most favorable to the non-moving party).[5]

20                                **IV. DISCUSSION**

21        Section 101 of the Patent Act defines the subject matter eligible for patent protection.  It

22   provides: "Whoever invents or discovers any new and useful process, machine, manufacture, or

23

24   ────────────────

     [5] There is a split of authority amongst district courts as to the appropriate burden of proof when
25   evaluating a lack of patent-eligible subject matter on the pleadings.  *See Papst Licensing GmbH &*
     *Co. KG v. Xilinx Inc.*, Nos. 16-CV-00925-LHK, 16-CV-00926-LHK, 2016 WL 3196657, at *7
26   (N.D. Cal. June 9, 2016) (collecting cases).  That issue need not be resolved here because
     regardless of the standard, as explained below, the claims are directed to patent-ineligible subject
27   matter.

28

United States District Court
Northern District of California

1    composition of matter, or any new and useful improvement thereof, may obtain a patent therefor,

2    subject to the conditions and requirements of this title."  35 U.S.C. § 101.  Whitepages contends

3    the '698 patent fails to qualify under this section.

4           The Supreme Court's decision in *Alice Corp. Pty. Ltd. v. CLS Bank International*, 134 S.

5    Ct. 2347 (2014), provides the relevant framework.  As explained in *Alice*, the Court has

6    "interpreted § 101 and its predecessors . . . for more than 150 years" to "'contain[] an important

7    implicit exception: Laws of nature, natural phenomena, and abstract ideas are not patentable.'"

8    134 S. Ct. at 2354 (quoting *Ass'n for Molecular Pathology v. Myriad Genetics, Inc*., 133 S. Ct.

9    2107, 2116 (2013)).

10          The *Alice* Court applied a two-step framework for determining patent eligibility,

11   previously articulated in *Mayo Collaborative Services v. Prometheus Laboratories, Inc*., 132 S.

12   Ct. 1289 (2012):

13

14          First, we determine whether the claims at issue are directed to one of those patent-
            ineligible concepts.  If so, we then ask, "[w]hat else is there in the claims before
15          us?"  To answer that question, we consider the elements of each claim both
            individually and "as an ordered combination" to determine whether the additional
16          elements "transform the nature of the claim" into a patent-eligible application.  We
            have described step two of this analysis as a search for an "inventive concept"—
17          i.e., an element or combination of elements that is sufficient to ensure that the
            patent in practice amounts to significantly more than a patent upon the [ineligible
18          concept] itself.

19

20   *Alice*, 134 S. Ct. at 2355 (internal citations omitted).

21          Whitepages contends the patent here is drawn only to abstract ideas.  *Alice* explained "[t]he

22   'abstract ideas' category embodies 'the longstanding rule that '[a]n idea of itself is not

23   patentable.'"  *Id*. at 2355. *See also Le Roy v. Tatham*, 14 How. 156, 175 (1853) ("A principle, in

24   the abstract, is a fundamental truth; an original cause; a motive; these cannot be patented, as no

25   one can claim in either of them an exclusive right").  *Alice* repeated the caution given in *Mayo*,

26   however, that the exclusion for "abstract ideas" must not be applied too broadly: "we tread

27   carefully in construing this exclusionary principle lest it swallow all of patent law."  134 S. Ct. at

28

CASE NO. 16-cv-00175-RS

United States District Court
Northern District of California

2354 (citing *Mayo*, 132 S. Ct. at 1293–94).  At some level, "all inventions . . . embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas."  *Mayo*, 132 S. Ct. at 1293.

On the facts before it, the *Alice* Court declined "to delimit the precise contours of the 'abstract ideas' category."  134 S. Ct. at 2357.  Instead, it found merely the concept of providing an "intermediated settlement" was not meaningfully distinguishable from the idea of "risk hedging" in *Bilski v. Kappos*, 561 U.S. 593 (2010).  In both instances, the idea involved was "a fundamental economic practice long prevalent in our system of commerce."  *Id*. at 2356.  The question, therefore, is whether the patent here similarly is directed only at abstract ideas, and if so, whether "significantly more" is claimed that would render it valid nonetheless.

**A. Alice Step One**

The first task is to determine whether the claims at issue are directed to a patent-ineligible concept.  The starting point is the patent itself.  The '698 patent is entitled "Post-Page Caller Name Identification System."[6]  Greenflight contends Whitepages infringed independent claims 1 and 5.

Claim 1 provides:

A system, functioning independently of a called party's telephone carrier and device, provides a calling party's CNAM after entry of the calling party's telephone number CID, comprising:

    a) an entry field, within a HTML web or mobile phone application, permitting the called party to inpute a query, post-page, specifying the CID;

    b) an SS7 interfacing node permitting real-time access to the SS7 network;

    c) a function serving as a direct interface between the called party's query and the calling party carrier's respective CNAM database;

    d) within the HTML web or mobile phone application, a display of the successfully queried calling party CNAM.

---

[6] A "page" simply is another way to say "call," so "post-page" refers to looking up the name associated with a phone number after receiving a call.

'698 patent at 4:41–54.

Claim 5 provides:

A method for providing a called party with the calling party's CNAM after a network page, independent of interaction with the carrier or device receiving the page, comprising the following steps:

a) entering of the calling party's telephone number CID into a web HTML or mobile phone application query field;

b) connecting to the PSTN via an SS7 interfacing node;

c) directly querying the calling party carrier CNAM database with the CID query entry;

d) displaying the successfully queried calling party CNAM on the HTML web or mobile phone application user interface.

'698 patent at 5:1–17.

Put in plain language, the invention permits users to input a phone number on the web or a mobile phone app, determine the number's carrier, search the carrier's name database, and return the name associated with the phone number. The patent employs industry-standard technology to perform a longstanding business practice, with no asserted improvement other than to use generic internet applications to obtain certain customer side advantages. As such, the claims are directed to the patent-ineligible abstract idea of looking up a name associated with a phone number.[7]

To begin, that process is one humans can perform by sliding a finger down the columns of a phone book, suggesting it "qualifies as an 'abstract idea' for which computers are invoked merely as a tool."[8] *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1336 (Fed. Cir. 2016). *See*

---

[7] Though touched on here, the "improvements" Greenflight cites are putative inventive concepts best addressed at *Alice* step two. *See Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 715 (Fed. Cir. 2014) ("[A]ny novelty in implementation of the idea is a factor to be considered only in the second step of the *Alice* analysis."); *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1339 (Fed. Cir. 2016) (analyzing putative improvement at step one but stating "in other cases involving computer-related claims, there may be close calls about how to characterize what the claims are directed to. In such cases, an analysis of whether there are arguably concrete improvements in the recited computer technology could take place under step two").

[8] It is worth noting that relying on a computer to perform routine tasks more quickly," like the

1  also, e.g., *CyberSource Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366, 1372 (Fed. Cir. 2011)

2  (claim for verifying the validity of a credit card transaction over the Internet was invalid because

3  the "steps can be performed in the human mind, or by a human using a pen and paper"); *Mortg.*

4  *Grader, Inc. v. First Choice Loan Servs. Inc.*, 811 F.3d 1314, 1324 (Fed. Cir. 2016) (claims for

5  computer-implemented system to enable borrowers to shop anonymously for loan packages were

6  abstract where "[t]he series of steps covered by the asserted claims . . . could all be performed by

7  humans without a computer").  The specification also suggests lookups and reverse lookups are

8  longstanding business practices, *see* Dkt. No. 21, Ex. A at 1:19–63 (giving background and

9  describing "typical[]" caller name query); Countercl. ¶ 12 (noting Baby Bell operators disbursed

10 paper phone books to landline customers, enabling lookups and reverse lookups), and Greenflight

11 concedes reverse lookup was practiced in a manner similar to the invention prior to the patent's

12 filing date.  For instance, in the late 1990s, Greenflight avers Whitepages copied phonebooks to an

13 internet searchable database, which "allow[ed] reverse telephone number lookups via the internet

14 to become possible for the mainstream telecom customer."  *Id.* ¶ 13.

15      Greenflight counters the claims "are not simply directed to finding out the identity of the

16 person associated with a phone number, but are directed to a *particular way* of doing so" not

17 previously available.  Opp'n at 8:9–11 (emphasis added).  That "particular" way employs a

18 generic web browser to "connect[] individual users over the Internet to proprietary carrier CNAM

19 databases *via an SS7 interfacing node*."  *Id.* at 7:14–15 (emphasis added).  The patent, according

20 to Greenflight, is thus directed to "a specific *improvement* in existing cell phone and VOIP

21 technology" because, employing this node, users learn in "real-time" the person to whom numbers

22 are registered.  Opp'n at 7:7–8 (emphasis added)

23      This argument is unavailing.  Greenflight admits it did not invent the SS7 interfacing node,

24 Oral Arg. Tr. 11:25–12:3, and names can be accessed *only* by using the SS7 query, Countercl. ¶

25

26

27 reverse lookup at issue here, "is insufficient to render a claim patent eligible." *OIP Techs., Inc. v. Amazon.com, Inc.*, 788 F.3d 1359, 1363 (Fed. Cir. 2015).

28

CASE NO. 16-cv-00175-RS

United States District Court
Northern District of California

United States District Court
Northern District of California

20.  It further concedes use of SS7 technology "is such a common occurrence that the telecom industry simply refers to it as a name 'dip.'"  Countercl. ¶ 20.  The specification reinforces the contention that the SS7 interfacing node is not an "improvement" of the existing technology, noting "technical protocols for Caller ID [have] evolved . . . to what is now *industry-standard* implementation over the PSTN SS7 network."  Dkt. No. 21, Ex. A at 1:53–55 (emphasis added).  The upshot is the claims are directed to "applying a known business process to the particular technological environment of the Internet," *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1259 (Fed. Cir. 2014), as opposed to a "specific asserted improvement" to "an existing technology" related to reverse lookup.[9]  *Enfish*, 822 F.3d at 1336, 1337.  *See also* Dkt. No. 21, Ex. A at 5:1–13 (reciting generalized steps including "entering" the number, "connecting to" the CNAM, "querying" the CNAM, and "displaying" the result).  Lacking concrete application grounded in new technology, the idea is impermissibly abstract.  *See Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 722 (Fed. Cir. 2014) (Mayer, J., concurring) ("An idea is impermissibly 'abstract' if it is inchoate . . . It can escape the realm of the abstract only through concrete application.  This concrete application is new technology . . . .").

**B. Discovery and Claim Construction**

Greenflight requests any ruling on step two be postponed until after discovery and claim construction.  It would like to investigate whether the claim elements are actually inventive, provide evidence of copying and commercial success, and obtain expert testimony on what was previously known in the art.  Further, Greenflight notes Whitepages' answer to Greenflight's counterclaim states certain claim terms are ambiguous, including "interfacing node," "permitting real-time access," "direct interface," and "directly querying."  Whitepages does not believe claim construction is warranted in connection with the instant motion, but Greenflight disagrees because

---

[9] For that reason, this case is unlike *Enfish*, where the patent was directed to an "*innovative* logical model," *Enfish*, 822 F.3d at 1330 (emphasis added), and unlike *DDR*, where the patent "override[d] the routine and conventional sequence of events ordinarily triggered by the click of a hyperlink," 773 F.3d at 1258.  Both of those cases involved technological improvements that simply are not found here.

1    it asserts those terms are relevant to deciphering the inventive concept.

2         Where, as here, the court has "a full understanding of the basic character of the claimed

3    subject matter," patent eligibility properly may be resolved on the pleadings without providing for

4    discovery.  *Content Extraction and Transmission LLC v. Wells Fargo Bank, Nat. Ass'n*, 776 F.3d

5    1343, 1349 (Fed. Cir. 2014).  The factual averments in Greenflight's counterclaim, in combination

6    with the history set out in the specification, adequately afford the requisite level of understanding.

7    Additionally, while claim construction is often helpful, and sometimes necessary, to resolve

8    whether a claim is directed to patent-eligible subject matter, it "is not an inviolable prerequisite to

9    a validity determination under § 101."  *Bancorp Servs., L.L.C. v. Sun Life Assur. Co. of Canada

10   (U.S.)*, 687 F.3d 1266, 1273 (Fed. Cir. 2012).  Greenflight has neither explained how any

11   particular construction would alter the section 101 analysis, nor proposed any constructions that

12   might be viewed in a favorable light given the posture of this motion.  Accordingly, armed with

13   the requisite understanding of the nature and character of the '698 patent, it is appropriate to

14   proceed immediately to step two.

15        **C. Alice Step Two**

16        At step two, courts "examine the elements of the claim to determine whether it contains an

17   'inventive concept' sufficient to 'transform' the claimed abstract idea into a patent-eligible

18   application."  *Alice*, 134 S. Ct. at 2357 (quoting *Mayo*, 132 S. Ct. at 1294, 1298).  "A claim that

19   recites an abstract idea must include 'additional features' to ensure 'that the [claim] is more than a

20   drafting effort designed to monopolize the [abstract idea].'"  *Id.* (quoting *Mayo*, 132 S. Ct. at

21   1297).  Those "additional features" must be more than "well-understood, routine, conventional

22   activit[ies]."  *Mayo*, 132 S. Ct. at 1298.  Courts "consider the elements of each claim both

23   individually and 'as an ordered combination' to determine whether the additional elements

24   'transform the nature of the claim' into a patent-eligible application."  *Alice*, 134 S. Ct. at 2355

25   (quoting *Mayo*, 132 S. Ct. at 1298, 1297).

26        Here, the '698 patent lacks an inventive concept sufficient to transform the abstract idea

27   into a patent-eligible application.  Greenflight concedes it did not create or improve the preexisting

28

United States District Court
Northern District of California

United States District Court
Northern District of California

1     caller name databases.  Oral Arg. Tr. 11:14–16.  Nor did it invent the SS7 technology used to

2     query those databases, Oral Arg. Tr. 11:25–12:3, or the methods of looking up information on the

3     internet referenced in the claim language, *see id.* 12:12–13, 13:7.  Instead, the "invention," to

4     Greenflight, is a new "mechanism to access" the preexisting information, *id.* 11:18–20, i.e., using

5     "HTML web or mobile phone application[s]" to "bridge" the gap between users and CNAM

6     databases.  *See id.* 13:1–7.  The problem is that this new solution or "bridge" reduces to use of the

7     internet, and that plainly cannot provide the requisite inventive concept.  *Bascom Glob. Internet*

8     *Servs., Inc. v. AT&T Mobility LLC*, --- F.3d ---, 2016 WL 3514158, at *5 (Fed. Cir. 2016) ("An

9     abstract idea on an Internet computer network or on a generic computer is still an abstract idea."

10    (internal quotation marks omitted));  *Ultramercial*, 772 F.3d at 716 ("[T]he use of the Internet is

11    not sufficient to save otherwise abstract claims from ineligibility under § 101.").

12          To be clear, the patent discloses no programming, algorithm, unique hardware, or

13    technological or procedural improvements.  It invokes generic "web or mobile phone

14    application[s]," but discloses no new website, no new app, no new networking equipment, and no

15    new manner of querying a CNAM database.  Dkt. No. 21, Ex. A at 4:45–46.  There also is no

16    disclosure of how the internet interface is joined with the CNAM query.  At base, the patent

17    describes nothing more inventive than using a website to initiate the typical CNAM query.  Given

18    use of a computer or the internet "must involve more than the performance of 'well-understood,

19    routine, [and] conventional activities previously known to the industry,'" *Content Extraction*, 776

20    F.3d at 1347–48 (quoting *Alice*, 134 S. Ct. at 2359), taken alone or in combination, claims 1 and 5

21    lack an inventive concept sufficient to render the abstract idea a patent-eligible application.  *See*

22    *Alice*, 134 S. Ct. at 2359–60 ("The method claims do not, for example, purport to improve the

23    functioning of the computer itself.  Nor do they effect an improvement in any other technology or

24    technical field.  Instead, the claims at issue amount to nothing significantly more than an

25    instruction to apply the abstract idea . . . using some unspecified, generic computer.  Under our

26    precedents, that is not enough to transform an abstract idea into a patent-eligible invention.")

27    (internal quotation marks and citations omitted).

28

1    Nor do the dependent claims offer the requisite inventive spark.  Claim 2 requires the "web

2  or mobile phone application provide[] free-of-charge CNAM resolution for any of the end-user's

3  multiple telephony devices," permitting "cost-savings." Dkt. No. 21, Ex. A at 4:55–58.  This

4  simply is an instruction not to charge consumers for using the service on multiple devices.  Claims

5  3 and 6 target "significant cost savings . . . through an advertising display within the user

6  interface." *Id.* at 4:59–61.  That limitation is insufficient to confer patent eligibility.  *See*

7  *Ultramercial*, 772 F.3d at 715–16.  Lastly, claim 4 adds steps requiring the system to ensure the

8  phone number is not subject to "opt-out privacy controls," and the calling party actually placed a

9  phone call to the called party's device.  Dkt. No. 21, Ex. A at 4:62–67.  General privacy

10  protections are not considered sufficiently inventive, *see, e.g.*, *Intellectual Ventures I LLC v. Mfrs.*

11  *& Traders Trust Co.*, 76 F. Supp. 3d 536, 552–53 (D. Del. 2014) (claims relating to "maintaining

12  privacy of customer billing data" found ineligible under section 101), and in any event,

13  Greenflight makes no argument that any of the dependent claims supply the inventive concept.

14    Greenflight responds the claims in *combination* disclose inventive, patent-eligible subject

15  matter, invoking *Bascom Global Internet Services, Inc. v. AT&T Mobility LLC*.  There, like here,

16  "each claim element, by itself, was known in the art." *Id.* at *6.  The court found an inventive

17  concept, however, "in the non-conventional and non-generic arrangement of known, conventional

18  pieces." *Id.*  That is not the case here because the ordered combination of the elements in the

19  claim language mirrors the order in which those same elements appear in the specification's

20  description of existing technology.  *See* Dkt. No. 21, Ex. A at 1:62–2:5.

21    Next, Greenflight maintains the '658 patent "improves computing," but that contention

22  effectively rings hollow.  Greenflight's argument is that caller name functionality was unavailable

23  on many carriers at the time of filing.  Where it was available, users paid exorbitant fees to

24  subscribe to the feature as a premium service.  The patent, according to Greenflight, solved this

25  particular problem—and thus somehow improved computing—by permitting users to look up

26  names tied to phone numbers "without subscribing to a caller ID service or having to pay a fee."

27  Opp'n at 12:17–19.  If anything, however, these innovations are directed to an "entrepreneurial

28

CASE NO. 16-cv-00175-RS

United States District Court
Northern District of California

objective"; they simply are not technological.  *See Ultramercial*, 772 F.3d at 721 (Mayer, J., concurring); *OpenTV, Inc. v. Netflix Inc.*, 76 F. Supp. 3d 886, 893 (N.D. Cal. 2014) ("[T]he mere fact that generic computer processors, databases, and internet technology, can now be used to implement the basic idea, with certain perceived greater advantages, does not give rise to a patentable method.").

Greenflight also submits the invention does not have an overwhelming preemptive effect, but that contention is difficult to accept in light of the claim language.  The only new functionality is to make the "industry-standard" query accessible via the web or an app, without any additional disclosure as to how that process actually is to be done.  *See Alice*, 134 S. Ct at 2358 (noting generic computer implementation does not relieve preemption concerns).

In sum, the limitations of the '698 claims do not transform the abstract idea they recite into patent-eligible subject matter because they simply instruct the practitioner to implement reverse lookup on the internet using previously known technology.  Further, "the innovative aspect of the claimed invention is an entrepreneurial rather than a technological one," reinforcing the conclusion it appropriately is considered "patent ineligible." *Ultramercial*, 772 F.3d at 722 (Mayer, J., concurring).

## V. CONCLUSION

The '698 patent is invalid under 35 U.S.C. § 101.  The motion for judgment on the pleadings accordingly is granted.  Greenflight's counterclaims for patent infringement correspondingly are dismissed.

**IT IS SO ORDERED**.

Dated: July 25, 2016

_____
RICHARD SEEBORG
United States District Judge

United States District Court
Northern District of California